ACCEPTED
12-14-00155-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
3/19/2015 1:12:55 PM
CATHY LUSK
CLERK

# NO. 12-14-00155-CV

IN THE TEXAS COURT OF APPEALS FOR THE TWELFTH DISTRICT
TYLER, TEXAS

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
3/19/2015 1:12:55 PM
CATHY S. LUSK
Clerk

\* \* \* \* \*

## BRENDA BREWER, DEANNA MEADOR, PENNY ADAMS, and SABRA CURRY

### APPELLANTS

### V.

## LOWE'S HOME CENTERS, INC.,

### APPELLEE

\* \* \* \* \*

On Appeal from the 3rd Judicial District Court
Anderson County, Texas
District Court Cause No. 3-41083

\* \* \* \* \*

## APPELLANTS' BRIEF

---

Respectfully submitted,

| | |
|---|---|
| Matthew R. Pearson | Brendan K. McBride |
| State Bar No. 0078817 | State Bar No. 24008900 |
| mpearson@gplawfirm.com | Brendan.mcbride@att.net |
| GRAVELY & PEARSON, LLP | THE MCBRIDE LAW FIRM of counsel |
| 425 Soledad, Suite 600 | to GRAVELY & PEARSON. LLP |
| San Antonio, Texas 78205 | 425 Soledad, Suite 620 |
| (210) 472-1111 Telephone | San Antonio, Texas 78205 |
| (210) 472-1110 Facsimile | (210) 472-11111 Telephone |
| | (210) 881-6752 Facsimile |

## ATTORNEYS FOR APPELLANTS

1

# IDENTITY OF PARTIES AND COUNSEL

## Parties

Brenda Brewer                          Appellants
Deanna Meador
Penny Adams
Sabra Curry

                                       Appellee

Lowe's Home Centers, Inc.

## Counsel

Matthew Pearson
GRAVELY & PEARSON, LLP
425 Soledad, Suite 600
San Antonio, Texas 78205
(210) 472-1111 Telephone
(210) 472-1110 Facsimile
mpearson@gplawfirm.com              Appellate and Trial Counsel for Appellant


Brendan K. McBride
The MCBRIDE LAW FIRM
Of counsel to GRAVELY &
PEARSON, LLP
425 Soledad, Suite 620
San Antonio, Texas 78205
(210) 472-1111 Telephone
(210) 881-6752 Facsimile
Brendan.mcbride@att.net             Appellate Counsel for Appellant


Holly Williamson
Jamilah Mensah
Hunton & Williams, LLP
700 Louisiana, Ste. 4200
Houston, Texas77002
(713) 229-5700 Telephone           Counsel for Appellee, Lowe's Home
(713) 229-5750 Facsimile           Centers, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................... 3

TABLE OF AUTHORITIES ....................................................................................... 5

STATEMENT OF THE CASE ..................................................................................... 7

THE RECORD ............................................................................................................. 8

ISSUES PRESENTED ................................................................................................. 9

STATEMENT OF FACTS .......................................................................................... 10

    *Brenda Brewer* ..................................................................................................... 10

    *Deanna Meador* ................................................................................................... 13

    *Penny Adams* ....................................................................................................... 15

    *Sabra Curry* ......................................................................................................... 17

    *Lowe's Management Seeks "Lowe's Next Customers"* ......................................... 19

SUMMARY OF THE ARGUMENT .......................................................................... 25

ARGUMENT AND AUTHORITIES ......................................................................... 28

    I.   STANDARD OF REVIEW FOR DIRECTED VERDICT ................................................. 28

    II. THE EVIDENCE RAISES A GENUINE ISSUE OF FACT AS TO WHETHER
         APPELLANTS' WORKERS' COMPENSATION CLAIMS WERE A CAUSE OF THEIR
         TERMINATIONS. ............................................................................................... 30

        A.  The Evidence Shows Lowe's Management Forced The Employees To Work
            Against Their Light Duty Restrictions In Order to Make Them "Lowe's
            Next Customers." ......................................................................................... 34

            1.  *Knowledge of the Claims* ..................................................................... 35

            2.  *Expression of negative attitude towards injury* .................................... 36

3. *Failure to adhere to company policies* ..................................................... 37

4. *Discriminatory treatment compared to other employees* ............................. 39

B. The Evidence Supports That the Leave of Absence Policy Was A False Pretext; Policy Was Not Even Followed. ........................................... 41

PRAYER ......................................................................................................... 48

CERTIFICATE OF SERVICE ......................................................................... 50

CERTIFICATE OF COMPLIANCE................................................................. 50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Armendariz v. Redcats USA, L.P.*, 390 S.W.3d 463 (Tex. App. – El Paso 2012, no pet.) ..................................................................................................................................... 33

*Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222 (Tex. App. – Beaumont 2004, no pet.) ..................................................................................................................................... 33

*Baptist Memorial Healthcare Sys. v. Casanova*, 2 S.W.3d 306 (Tex. App.--San Antonio 1999, pet. denied) .................................................................................................... 41

*Benners v. Blanks Color Imaging, Inc.*, 133 S.W.3d 364 (Tex. App. – Dallas 2004, no pet.) ..............................................................................................................29, 31, 32

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227 (Tex. 2004)........27, 28

*Collora v. Navarro*, 574 S.W.2d 65 (Tex. 1978) ..................................................... 27

*Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444 (Tex. 1996) .................................passim

*Dallas Cnty. v. Holmes*, 62 S.W.3d 326 (Tex. App. – Dallas 2001, no pet.) ..................... 30

*Darpino v. T.D.C.J.-I.D.*, No. 12-03-00021-CV, 2003 Tex. App. LEXIS 10097, 6, 2003 WL 22839250 (Tex. App. – Tyler 2003, no pet.)(mem. op.)...................................... 27

*Deveaux v. Compaq Computer Corp.*, No. 01-95-01104-CV, 1996 Tex. App. LEXIS 4308, 15, 1996 WL 531959 (Tex. App. – Houston [1st Dist.] 1996, no writ) ..................... 44

*Echostar Satellite, L.L.C. v. Aguilar*, 394 S.W.3d 276 (Tex. App. – El Paso 2012, pet. denied) ..............................................................................................................40, 45

*Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903 (Tex. App. – Fort Worth 2009, pet. denied) ......................................................................................... 27

*Graham v. Atlantic Richfield Co.*, 848 S.W.2d 747 (Tex. App. – Corpus Christi 1993, writ denied) ............................................................................................................. 27

*Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514 (Tex. App. – Houston [1st Dist.] 2006, pet. denied) ........................................................................................31, 32

*Hertz Equip. Rental Corp. v. Barousse*, No. 01-10-00949-CV, 365 S.W.3d 46 (Tex. App. – Houston [1st Dist.] 2011 pet. denied) ........................................................... 31

*In the Estate of Allen*, 301 S.W.3d 923 (Tex. App. – Tyler  2009, orig. proceeding) ...... 28

*Jenkins v. Guardian Indus. Corp.*, 16 S.W.3d 431 (Tex. App. – Waco 2000, pet. denied) 30

*Kings Aire, Inc. v. Melendez*, 416 S.W.3d 898 (Tex. App. – El Paso 2013, pet. filed)40, 43, 44, 45

*Omoro v. Harcourt Brace & Co.*, No. 05-96-01454-CV, 1999 Tex. App. LEXIS 133, 1999 WL 10388, at *3 (Tex. App. – Dallas 1999, no pet.)(mem. op.) .................................. 41

*Parker v. Valerus Compression Servs.*, LP, 365 S.W.3d 61 (Tex. App. – Houston [1st  Dist. 2011, pet. denied) ..............................................................................31, 32, 44

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74 (Tex. 2000) ................. 27

*Selgas v. Henderson County Appraisal Dist.*, No. 12-10-00021-CV, No. 12-10-00050-CV, 2011 Tex. App. LEXIS 9091, 4, 2011 WL 5593138 (Tex. App. – Tyler 2011, pet. denied)(mem. op.) ................................................................................................. 27

*Terry v. S. Floral Co.*, 927 S.W.2d 254 (Tex. App. – Houston [1st Dist.] 1996, no writ)29, 44

*Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312 (Tex. 1994) ........................................ 32

*Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184 (Tex. 2007) ..................... 27

*Turner v. Precision Surgical, L.L.C.*, 274 S.W.3d 245 (Tex. App. – Houston [1st Dist.] 2008, no pet.) ................................................................................................... 30

*Wal-Mart Stores, Inc. v. Amos*, 79 S.W.3d 178 (Tex. App. – Texarkana 2002, no pet.) .. 30

*White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260 (Tex. 1983) ........................................ 28

# STATEMENT OF THE CASE

**Nature of the Case:** This is a workers' compensation retaliation case arising out of the termination of four employees of Lowe's Home Centers, Inc. ("Lowe's), who required the employees to work contrary to their work restrictions, effectively refusing to allow them to come back to work on "light duty" in order to mis-categorize the four employees as taking "personal leave," and ultimately terminating them under what Lowe's claims was its "absence control policy."

**Trial Court:** The 3rd Judicial District Court of Anderson County, Hon. Deborah Oaks Evans, presiding.

**Trial Court Disposition:** The case was called for trial on March 11, 2014. At the close of the plaintiffs' case-in-chief on March 14, 2014, the trial court granted a directed verdict in favor of Lowe's and orally rendered judgment that the plaintiffs take nothing. (RR6:98-99, Tab 1; CR6:307) On May 12, 2014, the trial court rendered a take nothing judgment dismissing all of the plaintiffs' claims against Lowe's. (CR6:307-309, Tab 2)

# **THE RECORD**

The record on appeal consists of a six-volume, Clerk's Record containing the pertinent papers filed in the Anderson County District Court proceedings below in ".pdf" format. References to the Clerk's Record will be cited as "(CR[Volume]:[Page(s)])." There is also a seven-volume Reporter's Record containing the transcripts of trial and related proceedings before the district court as well as the exhibits offered into evidence. References to the Reporter's Record will be cited as "(RR[Volume]:[Page(s)])." Some materials are duplicated and attached for the Court's convenience in the Appendix to this Brief, and shall be cited to as necessary.

# ISSUES PRESENTED

Lowe's moved for directed verdict on the ground that the plaintiffs had not proven causation and that their claims were precluded because they were terminated under Lowe's "absence control policy." (RR6:89-90) The trial court granted Lowe's a directed verdict on Appellants' claims for workers' compensation retaliation because the trial court found there was no evidence of causation. (RR6:99).

**Issue One**:

> Did the trial court err in granting a directed verdict where there was more than a scintilla of evidence on all five of the *Cont'l Coffee* factors from which a jury may infer causation?

> Considering all of the evidence on the record, as this Court must, there is more than a scintilla of evidence that the employees' workers' compensation claims were a cause of their terminations. There is evidence that Lowe's deliberately worked employees against restrictions to force employees to take additional leave that Lowe's mis-characterized as personal leave without the employees' request or knowledge, and to ultimately justify terminating the claimants' employment under the false pretext of Lowe's "absence control policy" even though Lowe's did not follow that policy for any of the four employees.

**Issue Two**:

> Did the trial court err in granting a directed verdict based on Lowe's argument that it was merely enforcing a neutral "absence control policy," where there was more than a scintilla of evidence that Lowe's did *not* follow the policy with regard to these four employees, there was evidence that Lowe's had a retaliatory motive, and where there was other evidence that the absence control policy was a false pretext?

9

# STATEMENT OF FACTS

This is a Worker's Compensation retaliation claim brought under Tex. Lab. Code §451.001. The four Appellants – Brewer, Adams, Curry and Meador – were all employed at Lowe's store in Palestine, Texas.

## Brenda Brewer

Brenda Brewer was hired by Defendant on December 5, 2006 as a sales associate in the Tools department at the Palestine store. (RR4:104-105; 8:8) On June 12, 2007, Brewer sustained an on-the-job injury while working in the tools department. She was picking up a heavy vice, one of 33 vices weighing more than 75 pounds each, when she felt her back "pop," causing her enormous pain and making her drop to her knees. (RR4:108) Brewer reported the injury to the HR manager, Janice Hardy, who advised her to sit down for a break to see if the pain would subside. (RR8:8) When the pain became unbearable, a co-worker filled out the injury paperwork, and Brewer went home. (RR4:108; 8:8-10)

Brewer had no prior back injuries or problems before this on-the-job injury in June 2007. (RR4:108) She saw a doctor about her back injury and was put on "light duty" restrictions for work. (RR4:108-110) On November 19, 2007, Brewer was offered a new light duty position at the "credit card table" and as "telephone operator," not to lift over ten pounds and with hourly stretch breaks – a position that Brewer accepted. (RR8:17; 4:110) Had Lowe's allowed Brewer to perform this light duty work position, she would have been physically able to do the job. (RR4:110)

10

However, when Brewer got back to work, Lowe's refused to follow the restrictions. Rather than stay at the credit card table and phone operator stations, Lowe's required her to work as a cashier by the Store Manager Julio Gonzalez and Operations Manager Nick Boren. (RR4:111) Despite Brewer reminding them that she was on physical restrictions, Lowe's managers required her to bend to scan merchandise and lift heavy items like cabinets out of carts. (RR4:112) Despite her restricted job as a phone operator, Brewer was then transferred to the back of the store to work in "receiving" as often as twice a week, where new merchandise arrived for sale and had to be checked in to the computer. (RR4:112-13) She was told that she would have to lift heavy items coming off of the trucks as part of her job in receiving and told she "could seek employment somewhere else" if she could not do it. (RR4:113)

On one occasion Brewer's back was hurting so badly from the work that she went to the new HR manager who asked to see her limitation sheet. When she showed it to him, he told her to "get that the *blank* out of [my] face," he did not want to see it. (RR4:114) Brewer was told the same thing by an employee in the receiving department when she showed him her restrictions – he threw her restrictions back at her, saying "he didn't want to see this shit." (RR4:126) Almost every other day Brewer was required to work against her restrictions, which worsened her back injury. (RR4:115) Brewer informed her doctor that she was being required to work against

11

her restrictions, which was documented in her medical records in February 2008. (RR4:117; 7:258-59)

In April, Lowe's offered Brewer a different "light duty" position back in the Tools department, with the restrictions that she "not lift/carry objects more than 10 lbs." or work more than six hours per day. (RR8:13) Brewer could have performed this job as well had Lowe's followed the restrictions. (RR4:119) Again, Lowe's disregarded the restrictions, requiring her to work at the dock climbing tall ladders while lifting and carrying tools that weighed more than ten pounds. (RR4:121-23) Lowe's managers, Gonzalez and Boren, would not allow her to take the short breaks her physical restrictions required. (RR4:121) When she complained about the work going beyond her physical restrictions, Boren confronted her in the back of the store and told her to "cowgirl up" and she could do "the job I told you to do or you can seek your employment somewhere else." (RR4:123)

Brewer continued working in violation of her restrictions culminating in a second back injury on October 29, 2008, while Brewer was working back in receiving again, lifting items off of trucks and checking them into the computer. (RR4:129) By February 2009, Brewer was in so much pain that she was no longer able to physically work and went on leave. (RR4:130) She saw a neurosurgeon in March 2009 who put her on more restrictions – not to lift more than 10 lbs., not to work any shift longer than 6-7 hours, no more than 4 shifts per week, regular breaks every 2 hours and limit work requiring stooping, bending and twisting or excessive walking. (RR8:16) Brewer

12

showed the revised restrictions to Lowe's, which was unable to provide any work that would stay within her physical restrictions. (RR8:131) Brewer remained on leave until October 31, 2009, when she was informed by Lowe's that she was being terminated for exceeding her maximum leave of 240 days. (RR4:132) Brewer received no warning that Lowe's would terminate her for exceeding her maximum leave time. (Id.)

**Deanna Meador**

Deanna Meador began working for Lowe's in December 2004 as a plumbing specialist. (RR3:30) Meador was eventually promoted to Department Manager for plumbing and electrical in December 2006. (RR3:35)

On October 8, 2007 Meador was helping a customer load merchandise onto a flat cart when she felt a pull in her lower back and a "pop." (RR3:43) She reported it to her Zone Manager, Mick Bohem, and filled out a workplace injury report. (RR3:43-44; 8:195) Meador went to the emergency room for treatment and was put on "light duty" physical restrictions – she was not to lift anything over 20 lbs, was not to do work requiring kneeling/squatting, bending/stooping, pushing or pulling heavy objects or climbing stairs and ladders. (RR3:44-47; 8:200)

Meador explained that her job as electrical and plumbing department manager consisted mostly of tracking sales, overseeing and supervising sales staff and filling out paperwork, and that she could have continued in that position if Lowe's had allowed her to have other employees perform the sort of manual labor that was outside her

13

restrictions. (RR3:41-43, 47) However, as with Brewer, Lowe's managers ignored the restrictions. Meador was pressured by Gonzalez to work outside her restrictions, climbing ladders and carrying merchandise. (RR3:49) She overheard Gonzalez telling Bohem that if she could not do her job then she would need to find other employment, that she was taking up too many hours they needed elsewhere in the store and they wished Meador "just would quit." (RR3:50)

Operations Manager, Nick Boren, made similar comments to Meador as he had to Brewer – to "cowgirl up," – telling her to carry and load freight and that they did not care what she had to do, she had to get the job done even though they were requiring her to exceed her restrictions. (RR3:52-53; 4:13-14) Gonzalez likewise would tell her to load heavy freight and put it away despite her restrictions, even pressuring her to do it faster even after she reminded him of her light duty work restrictions. (RR4:11-13) Meador was also often left to load heavy merchandise on her own, despite requesting assistance. This included 50-pound bags of concrete and assembled toilets that weighed up to 120 pounds each. (RR4:10-12) On one occasion, after informing Boren that some of her freight was too heavy for her work restrictions, Boren informed Meador she had to do it anyway or come by his office chiding her that she was a "big girl" and she could get it done by herself when she asked for assistance. (RR4:14) Meador was continually asked to work against her restrictions. (RR4:17) She reported this to the HR department, but nothing was ever done about it. (RR:4:16)

14

Meador continued to be worked against her restrictions by Lowe's as the department manager in plumbing and electrical up until Lowe's demoted her to "credit coordinator" in June 2009. She was told by the new store manager, Mr. Hooker, that she could no longer work on the sales floor any longer because of her physical limitations. (RR4:18-19) That did not stop Lowe's from making Meador continue to work beyond her restrictions. (RR4:21) Meador finally took a leave from work to have back surgery in December 2010. (RR4:22) Three months after the surgery Meador tried to return to work at Lowe's and was told by the HR manager that she could have a position as a phone operator that would fit within her restrictions. (RR4:24) A week later, Lowe's HR manager told Meador that she would not be allowed back to work at all without a full release from her doctor – not even for light duty work. (Id.)

On January 30, 2012, Meador received a letter from Lowe's informing her that her employment was terminated effective January 16, 2012 because she had exceeded the permissible 365 days of leave. (RR4:27) Meador received no notice or warning that she was on a leave that could result in her termination prior to receiving notice that she was terminated. (RR4:28)

**Penny Adams**

Penny Adams began her employment with Lowe's in December 2006 as a sales associate in the inside gardening department – selling lawn mowers and other gardening equipment, fertilizers and pesticides, as well as seasonal and Christmas

items. (RR4:179) Over the course of her employment with Lowe's Adams suffered three on-the-job injuries. The first was a mild back injury that occurred while she was unloading a truck in receiving. (RR4:184) This injury did not require her to miss any work or go on light duty restrictions, but she did have some physical therapy to help strengthen her back. (RR4:185) In March 2008, Adams was lifting a large plant in the garden center when she fell onto a cinder block and broke her back. (RR4:186)

After taking time off from work, she returned with light duty restrictions and was offered a position that ostensibly complied with her physical restrictions in the receiving area, with the restriction that she not lift more than 10 pounds and no kneeling, squatting, bending, stooping, pushing pulling, twisting, or climbing stairs. (RR4:187; 7:246) As with Brewer and Meador, Lowe's refused to recognize Adams's work restrictions. She was required to bend, twist and kneel and push and pull merchandise in order to check it in at the receiving dock. (RR4:188) She was regularly required to lift more than ten pounds. (Id.)

When Adams reported to supervisors that she was having to work beyond her physical restrictions she was told to put her "big girl panties on" and pull up her bootstraps, and "if you're a liability, you're going to be the next Lowe's customer." (RR4:191) Adams reported the situation to HR where she was assured they were getting additional help, which never came. (RR4:191-92)

A few months later Adams suffered her third on-the-job injury. In July 2008 she re-injured her back while helping to load portable outdoor storage buildings.

16

(RR4:194) She was still supposed to be on light duty at the time because of her prior injury. (Id.) Yet, despite her additional back injury, Lowe's continued to require Adams to work against her restrictions. This included helping customers load heavy items like fertilizer bags because there was no one else on the sales floor who would respond to Adams' requests for assistance with a customer. (RR4:196) Managers, including Gonzalez and Boren, would regularly make comments indirectly intended to pressure Adams into exceeding her restrictions and chiding her to work faster doing work that she should not have been doing at all. (RR4:197-200)

By February 2009, Adams back had taken all it could and she took time off from work to get treatment for scoliosis, which had been made worse by her back injuries at Lowe's. (RR4:201) She was notified in October 2009 that her employment was terminated for exceeding Lowe's 240-day maximum leave of absence period. (RR4:201; 7:252) As with Brewer and Meador, Adams also received no warning that she was going to be terminated for exceeding the leave of absence period permitted under Lowe's policy until after she had already been terminated. (RR4:203)

**Sabra Curry**

Sabra Curry also went to work for Lowe's in December 2006 as a receiving clerk. (RR5:59) Her job was to unload the trucks at the receiving dock when they delivered merchandise like paint, tiles, refrigerators, stoves and anything else sold by Lowe's and inventory those items as they entered the store. (RR5:60)

17

Curry suffered a back and knee injury in October 2007, when a broken pallet tipped over onto her from a forklift while unloading a truck bending her backward over a tool pallet. (RR5:68) Curry went to see a doctor the next day who put her on light duty restrictions. (RR5:69) Lowe's offered Curry a job as an outside garden sales associate, restricting lifting to 10 pounds and limited bending. (RR5:70; 8:108) Curry frequently had to help customers load heavy items such as bricks, paving stones and fertilizer because there were not enough employees to respond to requests for help and the employee, Jesse, who was supposed to help her would not respond to requests for assistance. (RR5:71)

Though she was not expressly told to work against her restrictions, she was pressured by managers to do so in indirect ways. (Id.) When she complained to Gonzalez that she could not get help, Gonzalez told her she just had to get the job done. (RR5:72) Her zone manager would pressure her to go see her doctor about getting off of light duty so she could get back on the job. (RR5:74) When she complained to Boren about working beyond her restrictions, he repeated the phrase that was a fixture among managers at the Palestine store that she should "cowgirl up" and that she needed to get the work done. (RR5:76)

As had the others, Curry notified the HR department that she was being worked against her restrictions, but nothing was ever done about it. (RR5:76) Despite her light duty restrictions, Curry was continuously worked contrary to her restrictions. (RR5:77) By December 2008, Curry was in too much daily pain to

continue working and took leave. (RR5:79) She received her termination letter in August 2009 noting the reason for termination was that she had exceeded the 240-day maximum leave of absence period. (RR7:85) As with the other three employees, there was no warning that she would be terminated under the leave of absence policy prior to her letter of termination. (RR5:79)

**Lowe's Management Seeks "Lowe's Next Customers"**

It was after her promotion in 2006 that Meador began attending manager meetings and interacting directly with Palestine store manager Gonzalez after he arrived around May 2007. (RR3:38-40) Because of this access, she was aware of the store management's approach to employees with Worker's Compensation claims.

For example, Gonzalez's catch phrase was that he would find a way to make injured employees "Lowe's next customer" – i.e. make them no longer employees. (RR3:51; 4:29-30) Gonzalez would complain that employees with workers' compensation injuries and work restrictions were taking up hours needed for other employees who could work without restrictions. (RR4:30) Gonzalez was also concerned because payments for workers' compensation benefits would count against the store's budgets and that this, in turn, was affecting his bonuses. (RR4:32) He made these comments several times. (Id.) Several other managers at the Palestine store made similar comments, including Boren and Bohem. (Id.) Their belief was that because injured employees were cutting into managers' bonuses, they should become "the next Lowe's customer." (RR4:33)

19

Indeed, these discussions included the very employees involved in this case. Meador listened to Gonzalez and Boren specifically discussing Brenda Brewer, saying that he thought her injuries were exaggerated, she was taking up hours on the schedule and not getting the job done. (RR4:33-34) Boren said similar things about Penny Adams – that she was not hurt as badly as she claimed and he was tired of her complaining and not getting her work done. (RR4:34) Boren, Gonzalez and Bohem all complained about Sabra Curry, that her workers' compensation claim was cutting into their bonuses, she was not hurt as badly as she claimed and that she needed to stop whining and get her job done. (RR4:35-36)

These conversations were corroborated by Shelley Tinsley, another Zone Manager at the Palestine store. Tinsely testified that Gonzalez, Boren and Bohem would regularly discuss the legitimacy of employee injuries during upper management meetings. (RR7:23) In these upper management meetings, however, Gonzalez was less guarded about what was going on at the Palestine store. Tinsely testified that Gonzalez intentionally moved injured workers around to try to get them to quit. (RR7:24) Gonzalez complained about workers' compensation affecting the bottom line at the store and impacting manager's bonuses. (RR7:24) He talked about how his goal was to make employees who had filed for workers' compensation "Lowe's next customers." (RR7:25) This attitude toward workers' compensation claimants filtered into the department manager meetings as well, with managers regularly saying that if injured workers cannot do their jobs they should be customers. (RR7:26)

20

Tinsely also testified that discussions in these upper management meetings often pertained to the four injured employees in this case. For instance, Gonzalez and other managers questioned whether Brewer's injury was sustained at Lowe's and talked about what could be done to make Brenda Brewer "Lowe's next customer." (RR7:27) They also discussed their doubts that Penny Adams's injury was sustained at Lowe's. (RR7:28) Tinsely also testified that she had personal knowledge that Gonzalez, Boren and Bohem would work Meador beyond her physical restrictions. (RR7:49) When it came to work beyond her restrictions, they "sent a message that she needed to do it" and that she could be written up if she did not. (Id.)

**Lowe's Handling of Workers' Compensation Claims and**
**The Leave of Absence Policy**

Lowe's was "self-insured" for workers' compensation claims. (RR5:203) The claims were handled through a third party claims administrator, but the benefits were actually paid by Lowe's itself. (Id.) The cost of these claims were charged in part to the local store's budget. (RR5:211) That, in turn, impacted store managers' bonuses, which were on a stair-stepped plan keyed to the store's success in meeting its budgetary expectations. (RR:212-213) Even small, additional expenses could make a significant difference in a manager's bonuses under this program. (RR5:213-14) In the case of the Palestine store, where all four of these employees worked, that particular store had its highest number of workers' compensation claims affecting its

budget in 2007-2008 (RR5:215) – the time period during which these four workers were being made into Lowe's next customers.

Under Lowe's official workers' compensation policies and procedures, there was a program to provide light duty work to injured and transitional employees. (RR5:205-207) That included, consistent with Texas law, making offers of work to injured employees to do light duty work consistent with their physical restrictions placed by the employees' doctors. (RR5:207)("The employer will only assign tasks consistent with the employee's physical abilities, knowledge and skills and will provide training if necessary.")

The reason for following those restrictions is in part to avoid reinjuring employees and to facilitate healing from injuries. (RR5:209) Lowe's corporate representative admitted that working employees against restrictions could aggravate an employee's existing injuries. (RR5:209-210)(Q: "if someone deliberately works an employee against their restrictions, there could be an increase of that employee aggravating their injury? A: Yes.")

Lowe's Leave of Absence policy provided for a number of reasons an employee could take leave: because of a workers' compensation-related injury, Family Medical Leave, personal leaves, and personal medical leaves. (RR6:6) However, under Lowe's policy, there was no limit to the number of days of leave that would be permitted for an injured employee with a workers' compensation claim. (RR6:7-9) However, if Lowe's re-designates the employee as being on a personal leave instead of

22

a workers' compensation leave, it then treats the employee as subject to the maximum number of days allowed under the Leave of Absence policy and terminates those employees ostensibly for violating the policy. (RR6:9-12)

Under Lowe's leave policy, a form has to be filled out either by the employee or by someone at the store designating that the employee was taking personal leave, and this would then be coded into Lowe's computer system. (RR6:13-15) As part of this process, the store is supposed to work through a personal leave checklist. (RR6:17) So an employee taking personal leave would have a personal leave request form and a personal leave checklist documenting that the leave policy was being followed. (RR6:18) These would ordinarily be kept in the personnel records for the employee. (RR6:19) A letter is then sent to the employee from Lowe's main office in North Carolina, informing the employee that they have been put on personal leave. (RR6:20) Under the Leave of Absence Policy, each employee was also to receive a letter warning specifically that they were nearing the end of the maximum amount of personal leave under the policy. (RR6:20-21)

For these four employees there were no leave of absence checklists in their employment records. (RR6:22) Indeed, none of the leave of absence policy was followed for these employees. For Brewer, there were no requests forms showing a leave of absence was requested or a screen shot of the data entry when the leave was started. (RR6:25, 28) When asked how Lowe's was even able to calculate the start date for the 240-day personal leave limit under which it terminated Brewer, Lowe's

23

corporate representative could not answer. (RR6:25) Likewise, there was no request form for Curry, Meador or Adams, or other documentation showing when they started on the "personal leave" for which they were ostensibly terminated. (RR6:26-27, 30, 31) As noted above, none of the employees were given the warning letters required under the policy either – notifying them that they were about to exceed the personal leave policy and be terminated. (RR4:28, 132, 203; 5:79)

# SUMMARY OF THE ARGUMENT

There was far more than a scintilla of evidence that Brewer, Meador, Adams and Curry were terminated because they had made workers' compensation claims and that the non-retaliatory reason offered by Lowe's was a false pretext. It was therefore error to grant a directed verdict and deny Appellants a fair opportunity to present their case to a jury.

Specifically, there was evidence that Lowe's management intentionally worked employees against their light duty restrictions in order to force them into quitting or taking additional medical leave that would then be improperly classified as personal leave subject to a the maximum leave policy.

The evidence showed that the store manager at the Palestine store specifically intended to move injured employees with work-related injuries into – in his words – "Lowe's next customer." The record further supports that Lowe's management did so to take the employees out of the workers' compensation program where the payments counted against the store's budget and impacted the managers' bonuses and to free up more hours to give to employees who were not on light duty restrictions. The effect of working employees against their restrictions and funneling them into Lowe's system as though they were on personal leave instead of workers' compensation related leave was to trigger their termination under the Leave of Absence policy.

Had they been correctly treated as workers' compensation claimants and not worked against their restrictions, all four employees could have continued to perform the light duty work assignments they were formally offered. They would not have been forced into taking the additional leave that Lowe's treated as violating the maximum days of allowed personal leave – which did not apply to workers' compensation-related leave.

This evidence was sufficient to create a genuine issue of material fact on causation under the factors announced by the Supreme Court of Texas in *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996). Considering the record as a whole, as the Court must, there was more than a scintilla of evidence that these four employees were terminated by Lowe's because they had made Worker's Compensation claims.

In addition, there was other evidence that Lowe's proffered reason for their termination – violation of the Leave of Absence policy – was a false pretext. The record showed Lowe's did not even follow that policy with regard to these four employees. There were no requests forms for personal leave filled out, nor any other documentation showing why and when these supposed personal leaves were taken. There were no letters notifying employees that they were now on personal leave. There were no letters warning employees that they were about to exceed the permissible leave of absence limits under the policy prior to their terminations.

The evidence of retaliatory intent and false pretext was sufficient to raise a genuine issue of material fact. It was therefore error to grant a directed verdict. The trial court's judgment should be reversed and this case should be remanded to the district court for a trial on the merits.

## ARGUMENT AND AUTHORITIES

### I.  STANDARD OF REVIEW FOR DIRECTED VERDICT

A trial court's directed verdict order is reviewed by the Court under a *de novo* standard of review.  *Selgas v. Henderson County Appraisal Dist.*, No. 12-10-00021-CV, No. 12-10-00050-CV, 2011 Tex. App. LEXIS 9091, 4, 2011 WL 5593138 (Tex. App. – Tyler 2011, pet. denied)(mem. op.)(*citing Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007)); *Darpino v. T.D.C.J.-I.D.*, No. 12-03-00021-CV, 2003 Tex. App. LEXIS 10097, 6, 2003 WL 22839250 (Tex. App. – Tyler 2003, no pet.)(mem. op.)(*citing Graham v. Atlantic Richfield Co.*, 848 S.W.2d 747, 750 (Tex. App. – Corpus Christi 1993, writ denied)).

A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App. – Fort Worth 2009, pet. denied).

In reviewing the granting of a directed verdict, the Court must determine whether there is more than a scintilla of evidence to raise a fact issue on the challenged elements. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233-234 (Tex. 2004)(*citing Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978)).  The Court must "consider all of the evidence in a light most favorable to the party against

whom the verdict was instructed and disregard all contrary evidence and inferences" and "give the losing party the benefit of all reasonable inferences created by the evidence." *Coastal Transp.* at 233 (*citing White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983)).

If the evidence supporting a finding rises to a level that would enable reasonable, fair minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *In the Estate of Allen*, 301 S.W.3d 923, 926-927 (Tex. App. – Tyler 2009, orig. proceeding); *see also Coastal Transp.* at 234. Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact, and the legal effect is that there is no evidence. *Id.*

The trial court granted a directed verdict on the ground that there was insufficient evidence to raise a genuine issue of material fact as to whether the employees' filing of their workers' compensation claims was a cause of their terminations. (RR6:99) Specifically, the trial court ruled:

> The Court specifically makes a finding that the causal connection hasn't been met. If necessary, on the rebuttal, the Court finds if it's found that cause was established that that's been rebutted by the employer to show that there was a legitimate reason for the discharge and so the directed verdict is granted.

(RR6:99, Tab 1).

Thus, the Court's review of the directed verdict ruling concerns two related issues. First, is there more than a scintilla of evidence that the filing of workers' compensation claims by Appellants was a motivating factor for their termination by

Lowe's. Second, did Lowe's conclusively establish that the sole reason for the termination of the four employees was the absence of leave policy.

As detailed in the above facts, the evidence shows the employees were pushed into taking additional leave by Lowe's managers working them against light duty restrictions. The personal leave policy was not actually followed leading up to the terminations. And the evidence shows management at Lowe's Palestine store intended to terminate these employees because their workers' compensation claims were affecting managers' bonuses and using up store hours limited to light duty work. Reasonable and fair-minded jurors could conclude on this record that Lowe's management worked these employees against restrictions as a pretext to terminating them under Lowe's absence control policy and thus, the policy was not the true reason for their terminations.

## II. THE EVIDENCE RAISES A GENUINE ISSUE OF FACT AS TO WHETHER APPELLANTS' WORKERS' COMPENSATION CLAIMS WERE A CAUSE OF THEIR TERMINATIONS.

Texas employs a burden shifting analysis for workers compensation retaliatory discharge claims under section 451.001. *See e.g., Benners v. Blanks Color Imaging, Inc.*, 133 S.W.3d 364, 369 (Tex. App. – Dallas 2004, no pet.). As part of its *prima facie* case, the employee "has the initial burden of demonstrating a causal link between the discharge and the filing of the claim for workers' Compensation benefits." *Terry v. S. Floral Co.*, 927 S.W.2d 254, 256-57 (Tex. App. – Houston [1st Dist.] 1996, no writ); *see also Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996) (applying standard of

proof for causation in whistleblower actions to anti-retaliation claims under workers' compensation); *Wal-Mart Stores, Inc. v. Amos*, 79 S.W.3d 178, 184 (Tex. App. – Texarkana 2002, no pet.) (stating that as "an element of a *prima facie* case for retaliatory discharge" the employee must "demonstrate the causal link between the discharge and the filing of the claim"); *Dallas Cnty. v. Holmes*, 62 S.W.3d 326, 329 (Tex. App. – Dallas 2001, no pet.) (a plaintiff proves a *prima facie* case by establishing that she "in good faith, filed a workers' compensation claim, and there exists a causal connection between the filing of the claim and the discharge or other act of discrimination.").

An employee does not need to show that the workers' compensation claim was the sole reason for the employer's conduct; it is sufficient to demonstrate that but for the filing of the claim, "the employer's action would not have occurred when it did had the report not been made." *Cont'l Coffee*, 937 S.W.2d at 450; *Turner v. Precision Surgical, L.L.C.*, 274 S.W.3d 245, 252 (Tex. App. – Houston [1st Dist.] 2008, no pet.). The filing of the Workers compensation claim must be *a* reason for the employer's adverse employment action, but not necessarily *the* reason.

An employee may prove the causal link between the adverse employment decision and the workers compensation claim by direct or circumstantial evidence. *Jenkins v. Guardian Indus. Corp.*, 16 S.W.3d 431, 436 (Tex. App. – Waco 2000, pet. denied). Circumstantial evidence of the causal link includes:

(1) knowledge of the compensation claim by those making the decision on termination;

(2) expression of a negative attitude towards the employee's injured condition;

(3) failure to adhere to established company policies;

(4) discriminatory treatment in comparison to similarly situated employees; and

(5) evidence that the stated reason for the discharge was false.

*Cont'l Coffee*, 937 S.W.2d at 451; *Benners*, 133 S.W.3d at 369.

This type of circumstantial evidence is relevant to determining whether a causal link exists, both in examining whether the employee established a *prima facie* case and the ultimate issue of whether the employee proved a retaliatory motive for the adverse employment action. *See generally Hertz Equip. Rental Corp. v. Barousse*, No. 01-10-00949-CV, 365 S.W.3d 46 (Tex. App. – Houston [1st Dist.] 2011 pet. denied) (reviewing circumstantial evidence identified in *Cont'l Coffee* to determine whether evidence was legally and factually sufficient to support finding of retaliatory discharge); *see also Parker v. Valerus Compression Servs.*, LP, 365 S.W.3d 61, 66-68 (Tex. App. – Houston [1st Dist. 2011, pet. denied)(citing Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 51-23 (Tex. App. – Houston [1st Dist.] 2006, pet. denied) (reviewing circumstantial evidence under *Cont'l Coffee* to determine whether plaintiff established fact issue in response to summary judgment motion)).

Once the employee establishes a *prima facie* claim, including a causal link, the burden shifts to the employer to rebut the alleged discrimination by offering proof of a legitimate, non-discriminatory reason for its actions. *Green*, 199 S.W.3d at 519;

*Benners*, 133 S.W.3d at 369. If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the employee "to produce controverting evidence of a retaliatory motive." *Green*, 199 S.W.3d at 519. As noted above, however, often the same circumstantial evidence that establishes the employee's *prima facie* case will also create a fact issue as to the truthfulness of the employer's proffered non-discriminatory reason. *Green, Parker*, supra.; *see also Tex. Div.-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994) (employee must controvert employer's neutral explanation of employment decision based on direct or circumstantial evidence). The employee must present evidence that the employer's asserted reason for the discharge or other adverse employment action was pretextual or challenge the employer's evidence as "failing to prove as a matter of law that the reason given was a legitimate, nondiscriminatory reason." *Benners*, 133 S.W.3d at 369.

Applying these standards to the evidence on this record, there was more than a scintilla of evidence to raise a genuine issue of material fact that the good faith workers' compensation claims were *a* cause of the termination of these four employees, and that the Leave of Absence policy was not only not followed for these employees, but was part of a scheme intended to force light duty employees into either quitting or into what Lowe's would categorize as personal leave by working them against their restrictions. This case should have been decided by a jury.

**A. The Evidence Shows Lowe's Management Forced The Employees To Work Against Their Light Duty Restrictions In Order to Make Them "Lowe's Next Customers."**

As explained above, causation can be proven by circumstantial evidence, including the five factors identified by the Texas Supreme Court in *Cont'l Coffee* as circumstantial evidence of causation. A claimant need not produce evidence of all five of these factors, but can create a fact issue by showing there was evidence of at least three of the five factors. *Armendariz v. Redcats USA, L.P.*, 390 S.W.3d 463, 469 (Tex. App. – El Paso 2012, no pet.); *Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222, 229 (Tex. App. – Beaumont 2004, no pet.) (the court concluded the employee had established a causal link between his discharge and his injury by "present[ing] circumstantial evidence on "most of [the] *Continental Coffee* factors."). This record contains evidence of all five factors. There was definitely a fact issue regarding causation that should have been submitted to a jury.

At the outset, it is important to clarify the precise nature of the retaliation alleged in this case. This is not purely an allegation that the employees were directly fired for making Worker's Compensation claims. Rather, the evidence shows that all four employees were systematically worked against their light duty restrictions, forcing them to take personal or medical leave because they were unable to perform the work they were being made to perform in violation of their physical restrictions. Thus, in considering when the retaliation occurred, and by whom, the Court should consider

the knowledge, statements and actions of the managers at the Palestine store, which is where the actual retaliation occurred.

1. *Knowledge of the Claims*

First, the record shows that managers were well aware that these four employees had made workers' compensation claims. As detailed above, there were two witnesses present at Lowe's management meetings who heard the store manager, Gonzalez, and other high-level managers including Mike Bohem, a Zone Manager, and Nick Boren, the Operations Manager, not only specifically discussing these four employees' workers' compensation claims, but doing so in negative terms – expressing doubts that they were really injured and plans to make them "Lowe's next customers." (RR4:33-34; 7:27-28)

According to Tinsley (also a Zone Manager), these managers – and particularly Gonzalez – frequently discussed their displeasure with the fact that these employees were on workers' compensation because of the impact these employees' claims and light duty statuses were having on the store budget and, hence, these managers' personal bonuses. (RR7:24-28) Meador, a Department Manager, was also privy to numerous instances in which Gonzalez expressed similar sentiments that the workers' compensation claims were impacting his bonuses. (RR4:32-36) In particular, Gonzalez explained to Meador that Brewer light duty status was taking hours away from non-restricted employees to whom he would rather give those hours and that he wished Brewer would quit. (RR3:50) This is echoed in Tinsley's testimony, where she

35

explained that Gonzalez would move the injured employees around in order to get them to quit.  (RR7:24)

In addition, all four employees testified that they told managers – specifically Gonzalez Boren and Bohem – that they were being worked against their restrictions. (RR3:49-50; 4:121-24, 191-92; 5:72-73)  All four testified that they complained about being worked beyond restrictions and were all belittled for complaining, and pressured to continue to do the work against their restrictions by Gonzalez, Boren and Bohem.  (RR3:49-52; 4:12-15, 121-123, 194-200)  Indeed, it was frequently these very managers who were knowingly pushing these employees to work against their physical restrictions.  (Id.)

There was definitely evidence that the managers responsible for working these employees against their light duty restrictions to force them into taking personal leave were well aware that these employees had made workers' compensation claims.

2. *Expression of negative attitude towards injury*

There was also more than a scintilla of evidence of the second *Cont'l Coffee* factor –managers expressed a negative attitude toward the claimants' injuries. Specifically, Tinsley testified that the Palestine store managers discussed these four employees in particular during store manager meetings, expressing doubts about the severity of their injuries, doubts about whether they needed to be on light duty, and negative attitudes about workers' compensation claims in general because it impacted managers' bonuses.  (RR7:24-28)

36

This is also evident in statements by Gonzalez to Meador that he was going to make them "Lowe's next customers" and that he thought having light duty employees around cut into hours he needed to budget for non-restricted employees. (RR3:48-51) It was also consistently shown in the evidence that when these employees, all of whom were on light duty restrictions – complained that they were being worked against their restrictions they were belittled and told to "cowgirl up," put on their "big girl panties" and other demeaning statements. (RR3:52-53; 4:13-14, 123, 191; 5:76)

They were also threatened directly and indirectly with losing their jobs if they refused to do work beyond their restrictions. (RR3:50, 52-53; 4:13-14; 5:72) According to Tinsely, managers often repeated Gonzalez's catch-phrase that if injured employees could not do the work, they should be "Lowe's next customer." (RR7:25-26)

Thus, there is evidence to support the second *Cont'l Coffee* factor as well. The managers at Lowe's Palestine store regularly expressed negative attitudes about these employees' injuries and their status as workers' compensation claimants, including a hope that they could be made to quit or otherwise turned into "Lowe's next customers."

### 3. *Failure to adhere to company policies*

There is abundant evidence of the third factor. Not only was there substantial evidence that managers at the Palestine store failed to abide by Lowe's light duty provisions under its workers' compensation policy, but that Lowe's also failed to

37

abide by its "absence control policy" – the purported "neutral" policy under which these employees were ostensibly terminated.[1]

With regard to the first policy, the record showed that these employees were systematically worked against their restrictions after having been given light duty work assignments under Lowe's workers' compensation policy. For instance, Brewer was offered a job as an operator and at the credit card desk, which she accepted and could have performed with her injuries, but was promptly moved to receiving, where she was made to lift, turn and move heavy items beyond her restrictions. (RR4:112-116) Nothing was done in response to her complaint that she was made to work beyond her restrictions. On one occasion, Brewer had her light duty restriction form thrown back at her when she tried to explain her restrictions. (RR4:126)

Lowe's then moved Brewer to the loading dock where she again was worked consistently beyond her physical restrictions. (RR4:122-23) When she complained about the work going beyond her physical restrictions, Boren confronted her in the back of the store and told her to "cowgirl up" and she could do the "the job I told you to do or you can seek your employment somewhere else." (RR4:123) This is consistent with Tinsley's testimony that Gonzalez's plan was to move injured employees around to make them quit. (RR7:24)

---

[1] The evidence of the violation of Lowe's absence control policy is addressed separately in Section B, infra.

As detailed above, all four of these employees were regularly worked beyond their light duty restrictions and were derided, pressured and ignored when they tried to complain. This was definitely in violation of Lowe's workers' compensation policy. Lowe's corporate representative at trial testified that the light duty policy was in effect for Worker's Compensation claimants with physical restrictions, and was to be honored and respected by managers to prevent employees from suffering additional injuries or slowing down their healing from prior injuries. (RR5:205-210)

4. *Discriminatory treatment compared to other employees*

There is also evidence that these employees were treated differently than other employees because they had made workers' compensation claims and were subject to light duty restrictions under Lowe's workers' compensation policy. Lowe's testified that light duty was made available to both workers' compensation claimants with medical restrictions and to other employees who were injured from non-work-related injuries and "transitional employees." (RR5:205-207) Under the light duty policy, Lowe's managers were only supposed to assign employees tasks that fit within their physical limitations, knowledge and skills. (RR5:207)("The employer will only assign tasks consistent with the employee's physical abilities, knowledge and skills and will provide training if necessary.")

However, the evidence here was that Gonzalez and his management team were displeased with the effect of the workers' compensation claims on the store budget and their managers' bonuses, and sought to move the employees around to make

39

them quit. (RR7:24-28) There was abundant evidence – detailed above – that these employees were systematically worked against their physical and light duty restrictions. The reason for this was because an employee that was *not* on leave due to an injury involving workers' compensation was subject to the maximum leave requirement under the policy, but there was no limit to the number of leave days an employee could take because of a workers' compensation-related injury. (RR6:7-9) Thus, given testimony that Gonzalez sought to move employees around to make them quit, was negative about these employees' injuries, consistently worked them against restrictions, a reasonable jury could infer discriminatory treatment. These employees were specifically targeted to be worked against restrictions to force them to take leave from work that could then be categorized as "personal" leave subject to the absence control policy and terminated under that policy as a pretext. This is even more apparent when the Court considers how the absence control policy was actually applied to these four employees, which is addressed in the next section.

At this point, the Court should already find there was error in granting a directed verdict based on causation and Lowe's proffered non-discriminatory reason. There is sufficient evidence of the first four of the five *Cont'l Coffee* factors – and therefore enough circumstantial evidence to establish both that the terminations of these four employees were caused by their making of workers' compensation claims, and that they were deliberately worked against their light duty restrictions in violation of Lowe's workers' compensation policy either to get them to quit, or to force them

40

into taking what Lowe's could ostensibly categorize as personal leave in order to fire them under the false pretext that they were applying a neutral absence control policy.

That alone is enough to require this Court to reverse the directed verdict and remand this case for a new trial. However, there is also critical evidence of the other *Cont'l Coffee* factor – Lowe's proffered explanation is not the true reason.

## B. The Evidence Supports That the Leave of Absence Policy Was A False Pretext; Policy Was Not Even Followed.

The final factor under *Cont'l Coffee* is whether the stated reason for the discharge is false. As with the other four factors, there is more than a scintilla of evidence that these four employees were fired because they made workers' compensation claims independent of the purportedly neutral application of Lowe's absence control policy. Rather, the evidence shows Lowe's managers mis-categorized workers' compensation claimants as though they were taking "personal" leave to trigger the maximum leave provision of the policy – which otherwise would not have applied if Lowe's treated them as workers' compensation claimants they actually were.

Where an employee's termination is claimed to be the result of an attendance policy, the employee raises a fact issue by providing some evidence of retaliatory intent. *Kings Aire, Inc. v. Melendez*, 416 S.W.3d 898 (Tex. App. – El Paso 2013, pet. filed); *Echostar Satellite, L.L.C. v. Aguilar*, 394 S.W.3d 276, 288 (Tex. App. – El Paso 2012, pet. denied); *see also Baptist Memorial Healthcare Sys. v. Casanova*, 2 S.W.3d 306, 309 (Tex. App.--San Antonio 1999, pet. denied); *Omoro v. Harcourt Brace & Co.*, No. 05-96-

01454-CV, 1999 Tex. App. LEXIS 133, 1999 WL 10388, at *3 (Tex. App. – Dallas 1999, no pet.)(mem. op.)(employee may raise fact issue in face of attendance policy compliance by producing competent "evidence of a retaliatory motive").

To begin with, the absence control policy was not even followed as to these four employees. For each employee, there should have been a form or computer screen capture in their employee file showing that a request for personal leave had been made for each employee. Yet there were no forms for any of these four employees. (RR6:26-28, 30, 31) Each employee's personnel file should have also had a leave of absence checklist if this had been the start of a personal leave – yet there were none. (RR6:22)

In fact, since there was no documentation showing when and why these supposed personal leaves were initiated, Lowe's was unable to demonstrate how it could even calculate whether the maximum leave time had been exceeded. When asked how Lowe's was even able to calculate the start date for the 240-day personal leave limit under which it purportedly terminated Brewer, Lowe's corporate representative could not answer. (RR6:25)

There should also have been warning letters to each employee that went out prior to exceeding the personal leave maximum had these employees actually been properly subjected to the personal leave policy. (RR6:20-21) There were none – indeed none of the four workers knew they had been categorized as being on personal

42

leave subject to a maximum number of days until they each received their letter of termination. (RR4:28, 132, 203; 5:79)

The leave of absence policy was not even followed by Lowe's with regard to these four employees. In fact, it does not even appear that any part of it was followed other than issuing termination letters to set up the pretext that these employees were fired for taking too much personal leave instead of being fired for making workers' compensation claims.

This evidence not only further supports the third *Cont'l Coffee* factor – failure to abide by set policies – but it also supports the fifth factor – Lowe's stated reason for the termination of these employees was false. If the neutral application of the absence control policy were the actual reason for the termination of Brewer, Meador, Adams and Curry, then the evidence would show Lowe's actually followed that policy. The evidence shows exactly the opposite.

There is abundant evidence detailed above from which a reasonable jury could infer Lowe's absence control policy was a false pretext. Gonzalez's statements during managers' meetings that workers' compensation claims impacted the store budget and his bonuses and intent to make workers' compensation claimants into "Lowe's next customers" also shows Lowe's proffered non-discriminatory reason is a false pretext. Likewise, Tinsley's testimony that Gonzalez would move injured employees around in order to make them "quit" also supports the reasonable inference that they were not actually terminated for taking too much personal leave, but were terminated because

they were workers' compensation claimants whose claims and light duty status were impacting managers' bonuses.

In sum, a reasonable jury, had it been allowed to deliberate on this record, could have concluded that Lowe's managers in Palestine deliberately moved these four employees around, working them against their light duty restrictions in violation of Lowe's policy in order to get them to quit or force them to take time off from work that Lowe's would then categorize as "personal" leave subject to the leave of absence policy.

This is precisely the sort of situation the court found sufficient to support a jury's verdict against an employer in *Kings Aire*. There, the employer re-categorized the employee from the unlimited workers' compensation leave to a limited FMLA leave, then terminated the employee ostensibly for violating the amount of leave that would be available for FMLA. *Id.*, 416 S.W.3d at 910. There, as here, the record showed that the amount of leave had the employee been treated as taking comp-related leave was unlimited. Finding a genuine issue of material fact as to whether the employee requested to be put on FMLA leave or whether the employer did it without the employee's consent, the court concluded:

> There is a fact question as to whether Melendez elected to switch from the indefinite worker's compensation leave to the time-limited FMLA leave himself — in which case Kings Aire properly allowed a cause-neutral absence control "clock" to expire before termination — or whether Kings Aire switched him to time-limited FMLA leave without his consent for the specific purpose of retaliating from behind a cause-neutral veil.

44

*Id.* The court affirmed the jury's verdict in favor of the employee. *Id.*

Here, the evidence shows that Lowe's deliberately worked these employees beyond their light duty restrictions to force them into taking leaves of absence, and then, without the employees' request or knowledge, categorized all four employees as taking personal leave instead of what should have been unlimited workers' compensation leave.

The cases relied on by Lowe's involving neutral absence of leave policies are all easily distinguishable.[2] None of those cases involve direct evidence of discriminatory intent, like Gonzalez's statement that he sought to make workers' compensation claimants into Lowe's next customers. None of those cases involved evidence that workers were moved around and worked against their restrictions to get them to quit or take additional leave. None of those cases involve evidence that workers were offered light duty assignments according to a company policy put then were insulted, belittled, pressured and threatened when they complained that they were being worked beyond their light duty assignments and against their physicians' restrictions. None of those cases involve evidence that the workers were categorized as taking personal leave without their knowledge or consent. Finally, none of those cases involve evidence that the absence control policy was not even followed.

---

[2] *E.g. Parker*, 365 S.W.3d at 66-68; *Terry*, 927 S.W.2d at 256-57; *Deveaux v. Compaq Computer Corp.*, No. 01-95-01104-CV, 1996 Tex. App. LEXIS 4308, 15, 1996 WL 531959 (Tex. App. – Houston [1st Dist.] 1996, no writ)(not designated for publication);

This is far more evidence of retaliatory motive and false pretext in the application of an absence control policy than the courts found sufficient in either *Kings Aire* or *Echostar*, supra. The *Echostar* opinion is particularly instructive, given certain key facts it shares with this case:

> In the instant case, several of the *Continental Coffee . . .* factors are present and establish the initial causal link. For example, there is no question that Appellants had knowledge of the compensation claim and that the people making the decision to terminate were aware of the claim, a factor favoring Aguilar. Aguilar testified that other employees showed a negative attitude towards his condition, while Appellants provided contravening testimony. Appellants deviated from their policies in a number of respects, specifically in that Appellants' policy is to provide transitional or light duty for injured employees, however after only a few days on light duty, Aguilar was told to either return to his regular duties or be fired. Appellants further deviated from their policies by failing to notify Aguilar in writing, advising him of the expiration of his leave prior to terminating his employment.

*Id.*, 394 S.W.3d at 288-89.

Here, in addition to all of these same facts being present, the record also shows that workers' compensation claimants at the Palestine store: were specifically worked against their light duty restrictions; were derided, belittled and pressured when they complained and asked for their restrictions to be followed; were threatened with termination when they complained; were the target of a plan to make them quit because their injuries were costing store managers their bonuses; and never requested personal leave (nor were they ever told they were on limited personal leave until it was too late).

A reasonable jury could conclude both that the making of their workers' compensation claims was a cause of their terminations and that Lowe's stated alternative reason was false. It was error to direct a verdict for Lowe's.

## PRAYER

Appellants presented more than a scintilla of evidence supporting most, if not all, of the *Cont'l Coffee* factors by which causation can be proven in retaliation cases. There was evidence that Lowe's managers knew of the claims. There was evidence these managers expressed a negative attitude toward the injuries and claims and specifically intended to make these employees quit because managers were losing bonuses. Lowe's management failed to adhere to several company policies – including a complete failure to abide by the absence control policy that was offered as the non-retaliatory reason for the discharge of the four employees and failure to recognize or follow Lowe's light duty policy for workers' compensation claimants. Lowe's management singled out workers' compensation claimants on light duty to work them beyond their light duty restrictions to force employees into taking leave from work that Lowe's would then categorize as personal leave instead of workers' compensation-related leave.

There was far more than a mere scintilla of evidence in this case to show causation, retaliatory motive and false pretext. This case should be resolved by a jury. It was error to grant a directed verdict.

Appellants respectfully pray that this Court reverse the judgment of the district court and remand this case for a new trial on the merits. Appellants further request any other relief as the Court deems just and proper, including costs for this appeal.

Respectfully submitted,

GRAVELY & PEARSON, LLP
425 Soledad, Suite 600
San Antonio, Texas 78205
Telephone: (210) 472-1111
Facsimile: (210)   472-1110

By: _____

**Matthew R. Pearson**
State Bar No. 00788173

And

THE MCBRIDE LAW FIRM, of counsel
  to GRAVELY & PEARSON, LLP
425 Soledad, Suite 620
San Antonio, Texas 78205
Telephone: (210) 472-1111
Facsimile: (210) 881-6752

By: _____

**Brendan K. McBride**
State Bar No. 24008900

**ATTORNEYS FOR APPELLANTS, BRENDA BREWER, DEANNA MEADOR,  PENNY  ADAMS,  and SABRA CURRY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded on this 19th day of March, 2015 via electronic service through Texas.gov on Appellee's counsel of record:

Holly Williamson
Jamilah Mensah
Hunton & Williams, LLP

**Brendan K. McBride**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief is in compliance with the rules governing the length of briefs prepared by electronic means. The brief was prepared using Microsoft Word 2010. According to the software used to prepare this brief, the total word count, including footnotes, but not including those sections excluded by rule, is 9,490.

**Brendan K. McBride**

# NO. 12-14-00155-CV

IN THE TEXAS COURT OF APPEALS FOR THE TWELFTH DISTRICT
TYLER, TEXAS

* * * * *

## BRENDA BREWER, DEANNA MEADOR, PENNY ADAMS, and SABRA CURRY

### APPELLANTS

## V.

## LOWE'S HOME CENTERS, INC.,

### APPELLEE

* * * * *

On Appeal from the 3rd Judicial District Court
Anderson County, Texas
District Court Cause No. 3-41083

* * * * *

## APPELLANTS' APPENDIX TO BRIEF

_____

TAB

Transcript of Oral Ruling on Motion for Directed Verdict (RR6:98-99) ...................... 1

Trial Court's Final Judgment (CR6:307-309) ................................................. 2

Notice of Appeal (CR6:316-317) .......................................................... 3

# TAB 1

plaintiffs, through their own corporate representative that they failed to follow the very terms and conditions of the policy that they're moving for directed verdict on. So what you have, Your Honor, at the end of the day is overwhelming evidence that the plaintiffs had legitimate Worker's Compensation injuries, filed Worker's Compensation claims, were worked against those injuries which forced them off of work, and then the defendant used a policy to terminate them. That is discrimination under multiple methods of proof of discrimination.

THE COURT: Okay. Thank you.

MR. PEARSON: Would you like me to talk about the mitigation one or not?

THE COURT: No, sir.

The Court's sat through the evidence. I've heard the evidence and I've read the filings. I was a board certified labor and employment lawyer before I took the Bench so I'm very familiar with this area of practice. It's evolved a lot since 2002, which is when I took the Bench. The -- the area of law has evolved quite a bit. Frankly, most of the evolution has not been to the benefit of a plaintiff in the case. And the law has continued to evolve in this case.

The Court is granting a directed verdict, finding that the Worker's Compensation claim -- the Worker's Compensation claim, there's no causal connection between the

termination and the employee. The Court specifically makes a finding that that causal connection hasn't been met. If necessary, on the rebuttal, the Court finds if it's found that that cause was established that that's been rebutted by the employer to show that there was a legitimate reason for the discharge and so the directed verdict is granted.

You can prepare -- y'all prepare the order.

MS. WILLIAMSON: Yes, ma'am.

MR. PARSONS: We'll prepare it. Thank you, Your Honor.

THE COURT: I will do the same when I bring the jury in. I'm advising them of what I've done and I'm discharging the jury. After the discharge, you're welcome to speak to the jury. That's your perfect right and you can do so.

You can bring the jury in.

(Jury ushered in)

THE COURT: The courtroom may be seated.

Ladies and gentlemen of the jury, after you left the courtroom and during the lunch recess I had to resolve various legal issues presented by the attorneys. After a careful review of the evidence that was presented and the law that's applicable to the evidence, I've concluded that the plaintiffs failed to prove their case, therefore I'm required by law and I am so directing entry of judgment in favor of the

# TAB 2

CAUSE NO. 3-41083

| | | |
|---|---|---|
| BRENDA BREWER, DEANNA MEADOR, | § | IN THE DISTRICT COURT |
| PENNY ADAMS, SABRA CURRY, and | § | |
| DEBORAH BEANE, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 3rd JUDICIAL DISTRICT |
| | § | |
| LOWE'S HOME CENTERS, INC. | § | |
| | § | |
| *Defendant.* | § | ANDERSON COUNTY, TEXAS |

FILED FOR RECORD
14 MAY 12 AM 9:50
JANICE STAPLES
DISTRICT CLERK
ANDERSON COUNTY, TX

## AGREED FINAL JUDGMENT

**BE IT REMEMBERED** that on March 11, 2014, this case was called for trial. Plaintiffs Penny Adams, Brenda Brewer, Sabra Curry, Deanna Meador, and Deborah Beane appeared in person and announced ready for trial. Defendant Lowe's Home Centers, Inc. appeared through a representative and announced ready for trial.

A jury was impaneled and sworn, with no objection. Deborah Beane nonsuited her claims without prejudice after the second day of trial. Plaintiffs introduced their evidence and rested.

On March 14, 2014, Defendant made a motion for directed verdict on the grounds that the substantive law does not permit Plaintiffs to recover on their causes of action for workers' compensation retaliation under the Texas Labor Code, and on the grounds that the evidence conclusively proves a fact that negates as a matter of law Plaintiffs' right to judgment. Plaintiffs argued in rebuttal and rested.

The Court orally **RENDERED** judgment for Defendant on March 14, 2014. The Court found that Plaintiffs failed to meet their burden because there was no causal connection between the termination of Plaintiffs' employment and the filing of their workers' compensation claims.

2661

The Court further found that Defendant established a legitimate, nondiscriminatory reason for the discharge of Plaintiffs' employment.

Accordingly, the Court **ORDERS** that Plaintiffs take nothing and that Defendant recover costs from Plaintiffs.

This judgment incorporates by reference the Court's March 14, 2014 transcript regarding the "Ordering of the Directed Verdict."

This judgment finally disposes of all claims and all parties, and is appealable.

Signed this 12 day of _____, 2014.

_____
Honorable Judge Presiding

**APPROVED AS TO FORM ONLY:**

_____
Matthew Pearson
Attorney for Plaintiffs

_____
Jim Parsons
Attorney for Defendant

The Court further found that Defendant established a legitimate, nondiscriminatory reason for the discharge of Plaintiffs' employment.

Accordingly, the Court **ORDERS** that Plaintiffs take nothing and that Defendant recover costs from Plaintiffs.

This judgment incorporates by reference the Court's March 14, 2014 transcript regarding the "Ordering of the Directed Verdict."

This judgment finally disposes of all claims and all parties, and is appealable.

Signed this _____ day of _____, 2014.

_____
Honorable Judge Presiding

**APPROVED AS TO FORM ONLY:**

_____
Matthew Pearson
Attorney for Plaintiffs

_____
Jim Parsons
Attorney for Defendant

# TAB 3

CAUSE NO. 3-41083

| | | |
|---|---|---|
| BRENDA BREWER, DEANNA MEADOR | § | IN THE DISTRICT COURT |
| PENNY ADAMS, and SABRA CURRY | § | |
| | § | |
| | § | |
| V. | § | 3RD JUDICIAL DISTRICT |
| | § | |
| LOWE'S HOME CENTERS, INC., | § | |
| | § | ANDERSON COUNTY, TEXAS |

## PLAINTIFFS' NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

**Plaintiffs, BRENDA BREWER, DEANNA MEADOR, PENNY ADAMS and SABRA CURRY,** hereby file this notice of appeal of the above-styled case, seeking appellate review from the Twelfth District Court of Appeals, Tyler, Texas. Plaintiffs hereby appeal the Court's order granting directed verdict, the Court's Final Judgment and all evidentiary rulings made during the trial prior to the Court's order granting directed verdict. The Final Judgment was signed and entered May 12, 2014. This Notice of Appeal has been filed within thirty (30) days of the date the Court's judgment became final.

Respectfully submitted,

GRAVELY & PEARSON, L.L.P.
425 Soledad St., Suite 600
San Antonio, Texas 78205
(210) 472-1111 Telephone
(210) 472-1110 Facsimile

By: _____
Matthew R. Pearson
State Bar No. 00788173

ATTORNEYS FOR PLAINTIFFS

FILED FOR RECORD
At 11:00 o'clock

MAY 27 2014

JANICE STAPLES
District Clerk, Anderson County, TX
by_____ Dep.

1

2670

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument will be sent to the following counsel of record pursuant to TRCP.

Jim Parsons
Jim Parsons Law Offices
1007 N. Mallard Street
Palestine, TX 75801

Via USPS CMRRR

Holly H. Williamson
Jamila S. Mensah
Hunton & Williams, LLP
700 Louisiana, Suite 4200
Houston, Texas 77002

Via USPS CMRRR

Dated this 22nd day of May, 2014.

_____
MATTHEW R. PEARSON

2

2671